## Central Oil Shale & Refining Company v. Sunshine Oil & Gas Company.

### (Decided April 17, 1923.)

### Appeal from Allen Circuit Court.

1. Mines and Minerals—Contract for Purchase of Oil Lease Can be Rescinded for Misrepresentations as to Production.—A contract for the purchase of an oil lease in an undeveloped territory in which there were no pipe lines from whose run tickets a purchaser could

ascertain past production, so that he must rely for information thereon on the statements of his vendor, can be rescinded for fraudulent misrepresentations as to such production or for fraudulent concealment of an unplugged dry hole which materially affected the value of the producing well.

2.   Mines and Minerals—Evidence Held not to Show Fraud in Procuring Contract for Purchase of Oil Lease.—Evidence held to show that a contract for the purchase of an oil lease was not procured by fraudulent misrepresentations as to the production of the well thereon, nor by fraudulent concealment of an unplugged dry hole which affected the value of the well, but to show, instead, that the purchaser took a chance in a highly speculative venture so that he could not rescind his contract after the well ceased to produce.

CHANEY & DIXON and T. W. & R. C. P. THOMAS for appellant.

HARPER & DENTON for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

On the 19th day of December, 1919, the Sunshine Oil & Gas Company sold to the Central Oil Shale & Refining Co. a certain oil and gas lease on an eighty-acre tract of land in Allen county upon which there was a producing oil well and several dry holes.

The consideration was $40,000.00, $7,000.00 cash in hand and the balance to be paid in four equal installments, for which notes were to be executed for the sum of $8,250.00 each, to be due in one, two, three and four months respectively from that date. For brevity the parties will hereafter be referred to as the Sunshine Company and the Central Company.

The latter took charge of the lease on the date of the sale and operated the producing well until about the middle of February, 1920, at which time it gave to the Sunshine Company written notice that it was surrendering the lease and rescinding the escrow contract and stating its reasons therefor. Thereupon the Sunshine Company brought suit seeking to recover the unpaid considerations and to enforce its lien on the leasehold interest.

The Central Company pleaded that it was induced to enter into the contract by fraudulent misrepresentations and concealments upon the part of the Sunshine Company, and sought a rescission of the contract and judgment for the consideration paid.

The affirmative matter in the answer was controverted of record.   On submission the chancellor gave judgment for the Sunshine Company according to its prayer and the Central Company has appealed.

It appears in evidence that the Central Company was located in Chicago, and its officers reside there.   It desired to purchase some oil production and its vice-president, Mr. A. C. Elkins, came to Bowling Green for that purpose.

The Sunshine Company and its stockholders are Tennessee people.   Some of them had authorized Mr. Bull, one of its stockholders and a real estate agent, to sell its lease, and he was in Bowling Green seeking a purchaser.

An introduction between these gentlemen took place at the Mansard Hotel, and after a short conversation they left in Mr. Bull's machine to visit the well in question. At the well they met Mr. Maxwell, the agent in charge, and the three discussed the proposition.   That evening Mr. Elkins left for Chicago and after some correspondence returned a few days later and visited the property twice, discussed the matter with other agents of the company and saw the well pumped on three different occasions, and on the 19th of December entered into the contract mentioned and took possession of the property.

He again returned to Chicago, leaving Mr. Maxwell in charge.   Some time in January Mr. Maxwell had to go to Tennessee, and Mr. Elkins returned about the middle of the month, at which time the pumper informed him that the well was producing water.   He also claims to have discovered at this time an unplugged dry hole a short distance away, the existence of which had been concealed from him at the time of the purchase.   He continued to pump the well in question until about the middle of February, the water increasing and oil decreasing until it did not produce more than two barrels of oil per day, at which time he gave the notice above mentioned. He says that Mr. Bull, quoting Mr. Maxwell as authority, told him that the well would produce from 70 to 75 barrels per day and Mr. Maxwell told him the same.   That at the time he saw it pumping the flow of oil would indicate that quantity.   He admits, however, that Maxwell's assertion was that the well had pumped thirty-five barrels in five or six hours on different consecutive days, and upon that basis the estimate of daily production was made.   He further testifies that the well was, in his opin-

ion, destroyed by seepage of water from the unplugged hole, and gives it as his opinion that it never produced the amount stated by Maxwell.

Maxwell and the pumper assert positively that the well did produce thirty-five barrels in five or six hours on different consecutive days, and no one contradicts this assertion, unless the fact that the tankage on the leased premises would have been inadequate to hold the oil produced during the period the well was in operation, at the rate stated.

In this respect it is not shown that the pumping was continuous through the period. All the witnesses state that no trace of water was seen before the sale, and the witnesses for the appellee testify that Elkins was informed of the unplugged hole before the purchase, there being some evidence to the effect that he said he wanted to pump it before it was plugged.

At the time of this transaction the oil fields of Allen and Warren counties were largely undeveloped, and in the absence of pipe line returns and run tickets a purchaser could not ascertain past production, and for such information was dependent upon the statements of the vendor, and if under such circumstances he was induced to make a purchase by false and fraudulent misrepresentation as to such production, or by fraudulent concealment of an unplugged dry hole, which materially affected the value of the producing well, either would afford grounds to set aside the contract.

On the other hand, the stability and duration of an oil well are affected by many unseen elements and are necessarily uncertain. An operator cannot tell in advance whether a drilling operation will prove a "dry hole" or a "gusher," and dealing in such properties, especially in a new field, is highly speculative and develops a spirit of taking chances, and the evidence indicates that Elkins did this.

Taking the evidence as a whole we cannot say that the contract was procured by such false statements or that there was a fraudulent concealment of the unplugged hole; consequently a case for rescission was not made out. This seems to have been the view of the chancellor and his opinion is entitled to some weight.

Judgment affirmed.